188 N.J. Super. 309 (1982)
457 A.2d 476
ANGELO J. ERRICHETTI, PLAINTIFF,
v.
JOSEPH MERLINO, PRESIDENT OF THE NEW JERSEY STATE SENATE AND THE NEW JERSEY STATE SENATE, DEFENDANTS.
Superior Court of New Jersey, Law Division Mercer County.
Decided December 2, 1982.
*312 Henry F. Furst for plaintiff (Brown, Brown & Furst, attorneys).
Leon J. Sokol for defendants (Greenstone & Sokol, attorneys).
James J. Ciancia, Assistant Attorney General for the intervening defendant, State of New Jersey (Irwin I. Kimmelman, Attorney General of New Jersey, attorney).
LENOX, A.J.S.C.
Plaintiff Angelo J. Errichetti contends, by action in lieu of prerogative writs, R. 4:69, that he has been unlawfully deprived of his seat in the New Jersey State Senate, his annual salary and the other emoluments of his elective office. He originally *313 sought judgment restoring his office, salary and privileges, and declaring unconstitutional the actions of those ordering the deprivations and the statutes on the basis of which the actions were taken. Since his term of office has now expired the demand for restoration of his office and privileges is moot.
At issue now is plaintiff's right to payment of his salary for the period January 1, 1981 through January 12, 1982, ordered withheld by defendant Joseph Merlino, then President of the Senate. He seeks a declaration that during this period he was a duly elected member of the New Jersey State Senate. This contention gives rise to the issues of the constitutional validity of N.J.S.A. 19:3-25 and N.J.S.A. 2C:51-2 under which defendants contend plaintiff's Senate seat was vacated and forfeited. Because of the challenge to the constitutionality of the statutes, by order dated May 19, 1982, the Attorney General of New Jersey was granted leave to intervene as an interested party. R. 4:28-4(d). Cross-motions for summary judgment have been filed and argued. There is no genuine issue of material fact and resolution of the legal issues advanced will determine the controversy. R. 4:46-2. Judson v. Peoples Bank and Trust Co. of Westfield, 17 N.J. 67, 73-75 (1954).
Plaintiff was elected to membership in the New Jersey State Senate at a special election in the Fifth Legislative District on November 2, 1976. He has at all times met the age, citizenship, residence and suffrage requirements for membership. N.J. Const. (1947), Art. IV, § I, par. 2. He was seated and served the term for which he was elected. He was a successful candidate at the general election on November 8, 1977, and was re-elected to a four-year term expiring on January 12, 1982. At the commencement of the legislative session in January 1978, he was again seated as a Senator for the Fifth Legislative District.
During this session, in June 1980, he was indicted with other defendants for federal criminal offenses by a United States grand jury in the first of what has become known as the "Abscam" cases. At a trial of the indictment to a jury in the *314 United States District Court for the Eastern District of New York a verdict of guilty was recorded on August 29, 1980. The criminal violations alleged in the indictment of which he was convicted are crimes encompassed by the forfeiture of office provision of N.J.S.A. 2C:51-2.
Presumably because of his preoccupation with the indictment, trial, sentence and appeal from the judgment of conviction, plaintiff did not attend sessions of the Senate. Prior to the jury verdict he attended a session on July 28, 1980, but thereafter was continuously absent without excuse until the expiration of his term of office. Among the sessions he did not attend were ten consecutive sessions commencing with that held on July 31, 1980 and inclusive of the session conducted on December 11, 1980.
Four months after the return of the jury verdict Senate President Joseph Merlino on January 1, 1981 ordered the annual salary and the office and staff allowances payable by law to plaintiff be withheld. At that time no formal action had been taken by the Senate to expel plaintiff from his seat. Although he demanded his salary in monthly installments, no payments have been made. The order of the President of the Senate was made without prior notice to plaintiff of his intention to do so or of the reason for his action, and no opportunity was afforded plaintiff to be heard in opposition to it.
A judgment of conviction and sentence was entered in the United States District Court for the Eastern District of New York on August 13, 1981. The sentence included a term of imprisonment and a fine, but the execution of the sentence was stayed pending a decision by the United States Circuit Court of Appeals on an appeal filed by plaintiff. The judgment of conviction was affirmed, but a petition for rehearing en banc is pending.
Plaintiff has never resigned his office nor has he been officially advised of his removal therefrom. No action by the Senate to expel plaintiff by concurrence of two-thirds of all its members *315 has been taken pursuant to N.J. Const. (1947), Art. IV, § IV, par. 3. No vacancy in office was declared. Neither did the Senate direct the issuance nor the Governor issue a writ of election to file a vacancy. N.J. Const. (1947), Art. IV, § IV, par. 1.
The present verified complaint, filed on November 16, 1981, is plaintiff's first contention that he was never validly removed from his seat in the New Jersey State Senate. He challenges the constitutional integrity of N.J.S.A. 19:3-25 providing that the office of a member of the Senate or General Assembly shall be deemed vacant if he shall be absent unremittingly for ten days during any session unless excused from attendance, and N.J.S.A. 2C:51-2 providing for the forfeiture of public office when the office holder is convicted of a crime. They are unconstitutional, he argues, because they establish additional qualifications for office beyond those stated in N.J. Const. (1947), Art. IV, § I, par. 2, and because they provide a method for removal from office other than the exclusive means authorized by N.J. Const. (1947), Art. IV, § IV, par. 3. He contends, further, that if the statutes do not offend the foregoing provisions, they are otherwise unconstitutional as denying to a Senator holding office due process of law in declaring his office vacant or forfeited without prior notice of the action to be taken and an opportunity to be heard thereon.
The parties concede that unless plaintiff's elected office was constitutionally vacated pursuant to N.J.S.A. 19:3-25 or forfeited pursuant to N.J.S.A. 2C:51-2 he is entitled to judgment. However, defendants do not assert that the actions of Senate President Merlino on January 1, 1981 constituted a procedural removal of plaintiff from office. Rather, they allege it merely confirmed what had already occurred. Senator Merlino did not specify whether his action was based upon one, the other or both of the statutes. At that time plaintiff had failed to attend ten consecutive meetings of the Senate and the jury verdict of guilty had been rendered. The sentence and judgment of conviction, however, had not been entered. N.J.S.A. 2C:51-2(b) *316 provides that the forfeiture shall occur upon sentencing unless the court has ordered it to occur upon the finding of guilt by the jury. Therefore, if plaintiff did not vacate his office pursuant to N.J.S.A. 19:3-25 but did forfeit his office by reason of his criminal conviction, he would be entitled to judgment for the amount of his salary from January 1 to August 13, 1981, the date of his sentence, notwithstanding the order of Senator Merlino.
No objection has been interposed to the jurisdiction of the judiciary to rule upon this dispute involving the internal affairs of a legislative body. However, in view of the respectful nature of the relationship between the coordinate branches of government, it is appropriate to note the existence of this right. The United States Supreme Court addressed this issue in Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377 (1881), stating:
Especially is it competent and proper for this court to consider whether its [the legislature's] proceedings are in conformity with the Constitution and laws, because, living under a written constitution, no branch or department of the government is supreme; and it is the province and duty of the judicial department to determine in cases regularly brought before them, whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity to the Constitution; and if they have not to treat their acts as null and void. [103 U.S. at 199, 26 L.Ed. at 390]
See, also, Gewertz v. Jackman, 467 F. Supp. 1047 (D.N.J. 1979); Reilly v. Ozzard, 33 N.J. 529, 536 (1960); Wilentz ex rel. Golat v. Stanger, 129 N.J.L. 606 (E. & A. 1943); State v. Wrightson, 56 N.J.L. 126 (Sup.Ct. 1893).
The legislative power of removal from office is inherently political. The right is universally controlled by constitutional and legislative provisions, and in the absence of constitutional prohibition rests with the Legislature. Without such power the conduct of the affairs of government would be impaired by the inability to summarily remove from office one who during his term became incompetent or unfit to perform his official duties. Plaintiff's contentions must be viewed in this light. The constitutional prescription for membership, he argues, is exclusive, and a legislative provision imposing an additional requirement *317 for obtaining or holding office is impermissible. If correct, this means that an elected Senator may during his term be convicted of any number of crimes no matter how heinous, never attend a legislative session and remain in office unless expelled by the vote of two-thirds of all the members of the Senate.
The constitutional validity of N.J.S.A. 19:3-25 will be considered first, since a determination favoring constitutionality will render moot the challenge to the other statute. The Legislative Article of the Constitution provides only age, citizenship, residency and suffrage requirements for membership in the Senate. N.J. Const. (1947), Art. IV, § I, par. 2. The Constitution further provides that annual compensation shall be paid to members of the Senate "during the term for which they shall have been elected and while they shall hold their office," N.J. Const. (1947), Art. IV, § IV, par. 7; that each house of the Legislature is "the judge of elections, returns and qualifications of its own members," N.J. Const. (1947), Art. IV, § IV, par. 2; that expulsion of a member shall be "with the concurrence of two-thirds of all its members," N.J. Const. (1947), Art. IV, § IV, par. 3, and that "any vacancy in the Legislature occasioned by death, resignation or otherwise shall be filled by election for the unexpired term...." N.J. Const. (1947), Art. IV, § IV, par. 1. Relying upon Imbrie v. Marsh, 3 N.J. 578 (1950), plaintiff advances his argument that these provisions are exclusive and prohibit further requirements for holding office or procedures for removal.
The relevant portion of N.J.S.A. 19:3-25 provides:
When a person who shall be elected a member of the senate ... of this state ... shall during any session of such house be absent unremittingly for ten days, unless expressly excused by such house from attendance thereon ... his office shall be deemed vacant.
Concisely stated, plaintiff contends this statute imposes an attendance requirement not expressly or impliedly found in the Constitution. He views this as an unauthorized eligibility qualification, but asserts further that if intended only to afford the Senate the right to expel a member for its violation, it is equally *318 unauthorized under the Constitution which provides the sole method for removal from office.
N.J.S.A. 19:3-25 requires no construction. Words in a statute should be given their plain meaning and interpreted to afford a sensible result. Thomas v. Sosa, 172 N.J. Super. 146 (Law Div. 1979); Mulcahy v. Bergen Cty. Election Bd., 156 N.J. Super. 429 (Law Div. 1978). When the language is plain, there is no need for interpretation, Lopez v. Santiago, 125 N.J. Super. 268 (App. Div. 1973); State v. Davis, 175 N.J. Super. 130 (App.Div. 1980), absent explicit indication of a special meaning. Fahey v. Jersey City, 52 N.J. 103 (1968).
The sense and plain meaning of N.J.S.A. 19:3-25, when applied to the undisputed facts, is that plaintiff vacated his office on December 11, 1980 upon his tenth absence from meetings of the Senate. The statutory language "deemed vacant" has no other import, significance or purpose. This controversy has therefore focused upon the integrity of the statute rather than its effect. While further will be said regarding its interpretation, the statute is self-executing and the intent is that there be an automatic expulsion from office.
It is appropriate to consider first the issue of whether the statute is unconstitutional as establishing an added qualification for office beyond those in the Constitution relating to age, citizenship, residency and suffrage. Plaintiff at all times met those qualifications. Citing Imbrie v. Marsh, supra, plaintiff contends that the specifically established eligibility requirements for office are exclusive and the Legislature has no power to require additional or different qualifications. Imbrie involved a statute requiring of an office holder an oath different from and in addition to that in the Constitution. The Supreme Court found the constitutional oath was exclusive and the statute invalid. Referring to earlier authority for the proposition the court stated:
The maxim expressio unius est exclusio alterius is peculiarly applicable here. Such has been the current not only of the decisions of this State and elsewhere but of the authorities on public law. "Where the constitution prescribes the *319 manner in which an officer shall be appointed or elected, the constitutional prescription is exclusive and it is not competent for the legislature to provide another mode of obtaining or holding the office." Johnson v. State, 59 N.J.L. 535, 536 (E. & A. 1896). [3 N.J. at 585]
On the basis of the maxim expressio unius est exclusio alterius our courts have consistently so held. See Annotation, "Powers of Legislature to proscribe qualifications for or conditions of eligibility to constitutional office," 47 A.L.R. 481 (1927).
Defendants urge that the qualifications in N.J. Const. (1947), Art. IV, § I, par. 2, are minimum only and not intended to exclude establishment by the Legislature of others. It is their position that the Constitution does not expressly prohibit the enactment of this statute, and in view of the absence of the requisite clear and compelling implication of such prohibition plaintiff has failed to carry the heavy burden of establishing unconstitutionality. Defendants recite requirements for membership found elsewhere in the Constitution as evidence of nonexclusivity. They refer to Reilly v. Ozzard, supra, as the basis for distinguishing Imbrie, supra, from the case at bar, positing that Imbrie does not hold that a statute which adds to but does not alter the constitutional qualifications is prohibited and that the other cases cited in Imbrie are likewise distinguishable. Thus they urge that plaintiff's interpretation is contrary to the plain meaning of the Constitution and the long history of legislative enactments establishing additional qualifications for holding legislative office.
Assignment Judge O'Brien of Hudson County recently considered this issue in State v. Musto, 187 N.J. Super. 264 (Law Div. 1982). The opinion contains a comprehensive and scholarly discourse of the arguments and authorities on each side. It is exhaustive and further discussion would be merely repetitious. The determination of Judge O'Brien is appropriate for adoption in this case. He found it unnecessary to decide the question since the constitutional provisions regarding qualifications for election to office are immaterial to the issue of the constitutionality of a statutory expulsion from office. In this connection he said:

*320 It isn't necessary for the court to determine whether N.J.S.A. 2C:51-2(c) constitutes an added qualification for a constitutional officer, i.e., that he not have been convicted of a crime. This case is not an attempt to exclude Musto from assuming a Senate seat. He was a sitting senator at the time of his conviction and sentencing. In Powell v. McCormack, 395 U.S. 486 [89 S.Ct. 1944, 23 L.Ed.2d 491] (1969), the court noted the distinction between exclusion and expulsion. As Justice Douglas said in his concurring opinion:
And if this were an expulsion case I would think that no justiciable controversy would be presented, the vote of the House being two-thirds or more. But it is not an expulsion case. Whether it could have been won as an expulsion case no one knows. Expulsion for `misconduct' may well raise different questions, different considerations. Policing the conduct of members, a recurring problem in the Senate and House as well, is quite different from the initial decision whether an elected official should be seated. It well might be easier to bar admission than to expel one already seated. [395 U.S. 486, at 555, 89 S.Ct. 1944 at 1981, 23 L.Ed.2d 491]
While this portion of Judge O'Brien's opinion related to N.J.S.A. 2C:51-2 rather than N.J.S.A. 19:3-25, the difference is without significance. The question presented with regard to both statutes is not the right to be elected to office but whether the Legislature may prescribe reasonable standards for expulsion. As stated by Vanderbilt, C.J., plaintiff "paint(s) with too broad a brush," Strothers v. Martini, 6 N.J. 560, 563 (1951), for he has failed to recognize this distinction.
This case presents no issue regarding exclusion of plaintiff from being sworn as a member of the Senate. N.J.S.A. 19:3-25 does not establish a qualification for office but relates to the duties and responsibilities of a Legislator after assuming his office. This distinction is well established and is dispositive of plaintiff's arguments premised upon Imbrie v. Marsh, supra, and the cases cited therein involving statutes adding to qualifications to assume rather than continue in office, and Bond v. Floyd, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966), upon which plaintiff also relies. It is inappropriate to "undertake to resolve a constitutional challenge if the litigation may be disposed of without reaching the fundamental issue...." State v. Salerno, 27 N.J. 289, 296 (1958); Ahto v. Weaver, 39 N.J. 418 (1963); State v. Zucconi, 50 N.J. 361 (1967).
*321 The next issue, one of fundamental significance, is whether the application of N.J.S.A. 19:3-25 to a member of the State Senate is invalid because the Constitution prescribes the exclusive method by which a member's right to remain in office may be terminated. In this respect N.J. Const. (1947), Art. IV, § IV, par. 2, provides:
Each house shall choose its own officers, determine the rules of its proceedings, and punish its members for disorderly behavior. It may expel a member with the concurrence of two-thirds of all its members.
The power of removal, plaintiff contends, is exclusively vested by the Constitution in each house of the Legislature. Plaintiff's view is that a bar to such legislation arises by negative implication found in the constitutional language. Concededly, the statute contravenes no affirmative prohibition. There is no express statement that the removal clause is the sole means by which a sitting legislator may lose his seat.
It is appropriate to acknowledge the importance of this issue as involving not only plaintiff's monetary claim but also the inherent right of the people to be represented by the legislator of their choice. This principle has been effectively presented by plaintiff. The democratic representation of the people is the keystone of our system of government. The right to vote encompasses the right to representation by elected public officers.
A fundamental principle of our representative democracy is, in Hamilton's words, "that the people should choose whom they please to govern them." [Powell v. McCormack, 395 U.S. 486, 87 S.Ct. 1944, 23 L.Ed.2d 491 (1969)]
While this fundamental doctrine bears recognition, it is equally appropriate to consider the salutory purpose of the statute  that is, to assure that the people are being represented rather than abandoned in the legislative chambers.
Unlike the Constitution of the United States our State Constitution is not a grant but rather a limitation of powers. In the people, through their elected representatives in the Legislature, vest all powers not ceded to the Federal Government. Gangemi v. Berry, 25 N.J. 1 (1957); Gilbert v. Gladden, 87 N.J. 275 (1981). The Constitution provides the framework within which the *322 Legislature acts to further the will of the people. Only in the event of a conflict with powers delegated to the Federal Government in the United States Constitution or limited by our State Constitution is the Legislature restricted in its authority. Such restriction is the exception rather than the rule.
Justice Heher, writing for a unanimous court in Gangemi v. Berry, supra, comprehensively reviewed these basic concepts of the Republic and our State, and in doing so commented:
The theory of our political system is that the ultimate sovereignty is in the people, "from whom springs all legitimate authority"; and (1) the legislative authority in the States consists of "the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States," and the legislative department "is not made a special agency for the exercise of specifically defined legislative powers but is intrusted with the general authority to make laws at discretion"; and (2) the apportionment to this department "of legislative power does not sanction the exercise of executive or judicial functions, except in those cases, warranted by parliamentary usage, where they are incidental, necessary, or proper to the exercise of legislative authority, or where the constitution itself, in specific cases, may expressly permit it." Cooley's Constitutional Limitations (8th ed.), 81, 175 et seq.; 180, note. [25 N.J. at 9]
This principle of constitutional law is the essence of the issue under examination. In reviewing an act of the Legislature it is only when the prohibition clearly appears in the Constitution that it may be said to exist. The Constitution of this State contains no express prohibition against the enactment of N.J.S.A. 19:3-25. Nowhere does the document recite that the procedure in N.J. Const. (1947), Art. IV, § IV, par. 3, shall be the sole means of expulsion and that the Legislature may provide for no other. The question is narrowed then to whether the supposed intradiction is otherwise implied. Only if by implication it clearly appears that the Constitution forbids the enactment of general laws providing for vacation or forfeiture of legislative office may the statute under review be invalidated.
An evaluation of the constitutionality of the statute must be undertaken with deference to the axiomatic recognition that legislative enactments are presumed to be valid. Smith v. *323 Penta, 81 N.J. 65 (1979), app. dism. 444 U.S. 986, 100 S.Ct. 515, 62 L.Ed.2d 416, (1979); General Electric Co. v. Passaic Cty., 28 N.J. 499, 510 (1958), app. dism. 359 U.S. 1006, 79 S.Ct. 1146, 3 L.Ed.2d 987 (1959); In re Loch Arbour, 25 N.J. 258, 264-265 (1957). If there are reasonable constitutional alternatives to a finding of infirmity, they should ordinarily be adopted. 2A Sutherland, Statutory Construction (4 ed. 1973), § 45.11; Morss v. Forbes, 24 N.J. 341, 357 (1957). "[E]very intendment is to be made in favor of the validity of the statute," State v. Thermoid Co., 16 N.J. 274, 279 (1954), and a legislative act will not be declared void unless its repugnancy to the Constitution is clear beyond a reasonable doubt. Gangemi v. Berry, supra. To declare an act of the Legislature unconstitutional is an extreme pronouncement, to be made only when there is no possible legal accommodation between the force of the statute and the conflicting provision. Whyy, Inc. v. Glassboro, 50 N.J. 6 (1967), rev'd on other grounds, 393 U.S. 117, 89 S.Ct. 286, 21 L.Ed.2d 242 (1968). Even if an act is void according to what is deemed to be the correct view, its constitutionality should be sustained when there is another view that would support it. Attorney General v. McGuinness, 78 N.J.L. 346, 373 (E. & A. 1909).
The absence of an express constitutional prohibition against the enactment is of limited significance. Most constitutional law has developed through implication of principles not embodied in the express language of the document. It is fundamental that the intent of a writing is often found more clearly by inference than by a reading of the express language. When the implication is clear it is considered an integral part thereof. Brandon v. Montclair, 124 N.J.L. 135, 143 (Sup.Ct. 1940), aff'd 125 N.J.L. 367 (E. & A. 1940); Lomarch Corp. v. Englewood, 51 N.J. 108 (1968). Plaintiff carries a heavy burden in challenging the constitutionality of the statute to demonstrate that the constitutional prohibition arises by implication. Smith v. Penta and Gangemi v. Berry, both supra.
*324 In his challenge to the validity of N.J.S.A. 19:3-25 plaintiff places substantial reliance upon the maxim expressio unius est exclusio alterius. Our courts have uniformly held that this legal tenet, which declares "that the express mention of one thing implies the exclusion of another is purely interpretive in aid of intention, and not a rule of law...." Gangemi v. Berry, supra 25 N.J. at 11. In his dissenting opinion in Imbrie v. Marsh, supra, Justice Oliphant emphasized the need for care in its utilization:
While the maxim quoted has been applied in a few instances to the interpretation of constitutions, 2 Sutherland Statutory Construction (3rd Ed.), § 49.16, yet the maxim is one which should be applied with caution, Ibid., § 49.17. This is true a fortiori in applying it to a constitution. Jameson, Constitutional Conventions, § 572 et seq. [3 N.J. at 613]
Reliance upon such maxims expressing general principles and intended only as aids in the reasoning process can lead to improper interpretations.
It is certainly very hard upon a Judge, if a rule which he generally lays down, is to be taken up and carried to its fullest extent. This is sometimes done by counsel, who have nothing else to rely on; but great caution ought to be used by the Court in extending such maxims to cases which the Judge who uttered them never had in contemplation. [Lord Mansfield, C.J., Brisbane v. Dacres, 5 Taunt. 143, 162 (1813)]
Similar words of advice written over two centuries ago have applicability today.
Does not everybody see from hence, that you must first examine the law before you can apply the rule of construction? For the law must not be bent by the construction, but that must be adapted to the spirit and sense of the law. [Lord Camden, C.J., Entick v. Carrington, 19 How.St.Tr. 1029, 1060 (1765)]
Thus it is that our Supreme Court has cautioned against the mechanical application of expressio unius est exclusio alterius as if it were a rule of law. Gangemi v. Berry, supra. "[I]t usually serves to describe a result rather than to assist in reaching it." Reilly v. Ozzard, supra 33 N.J. at 539. There is little basis for the invocation of the doctrine in this case, and much reason to question its use. "Where, as here, the constitutional provision is prohibitory in nature, it surely can not mechanically be inferred that what was not prohibited was thereby affirmatively guaranteed." Ibid. The intention of the document *325 is to be ascertained from all available sources, not merely from the absence of a specific provision. The truth can better be found:
Not in the letter but in the spirit; for the letter killeth, but the spirit quickeneth. [St. Paul: 2 Corinthians 3:6]
The Constitution contains no grant to the Senate of exclusive authority to deal with the internal activities of its members. Nor may it be implied. It is appropriate for the entire Legislature to act upon the subject as it may affect both the Senate and the General Assembly. In the absence of a constitutional prohibition the Legislature may enact reasonable laws, and the reasonableness of N.J.S.A. 19:3-25 is found in the public good. It strains logical construction to conclude that the constitutional method of removal forbids it. The provision states only that the house "may expel a member with the concurrence of two-thirds of all its members." The word "may" is permissive, not mandatory, leaving open to the Legislature other reasonable methods appropriate. A contrary intention could readily have been stated. The language provides one means for the members of the legislative house to accomplish the internal result. It was not intended to afford a shield to a wrongdoing legislator against the force of a statute affording relief to the people from continued representation by one unqualified for office. As this subject is not "frozen by the Constitution [it] remains subject to law...." Reilly v. Ozzard, supra at 540.
It is significant that the Constitution itself provides means of removal from office other than that contained in the provision under review. While it may be argued that the totality of the constitutional removal methods are exclusive, those provisions and their significance warrant consideration.
Automatic removal of a member of the Legislature occurs if he takes a seat in Congress or accepts another state or federal office. The Constitution provides in such circumstance that "his seat shall thereupon become vacant." N.J. Const. (1947), Art. IV, § V, par. 3. By his action in accepting an office deemed to be in conflict with his legislative office he forfeits his right to *326 continue to serve in that capacity. The seat becomes vacant without notice, hearing or recourse being afforded by the constitutional provision. Likewise, the Constitution provides for expulsion from office by impeachment. N.J. Const. (1947), Art. VII, § III, par. 1. While the impeachment provision uses the language, "State officers," a member of the Legislature is included within that term. State v. Musto, supra. Another provision is N.J. Const. (1947), Art. IV, § IV, par. 1, which states that "[a]ny vacancy in the Legislature occasioned by death, resignation or otherwise shall be filled by election...." The implication of the use of the phrase "otherwise" is that alternative methods by which vacancies may occur will exist or may be provided by law. Had the framers' intention been to make the constitutional methods of removal exclusive, logic would dictate the use of language such as "otherwise herein provided." Cf. 63 Am.Jur.2d, Public Officers and Employees, § 178 at 736, and cited cases. The framers of the Constitution of 1947 had the power to decide what the policy of their document should be. Having stated their will by implication, however indirectly, it is the obligation of the court to recognize and obey it. Here the implication appears from the absence of a direction that the means by which a member shall lose his seat is limited by the Constitution. "[I]t is not an adequate discharge of duty for the courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before." Johnson v. U.S., 163 F. 30, 32 (1908).
There is no war between the Constitution and common sense. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); 84 A.L.R.2d 933. In harmony with sound reason is the conclusion that the people are not foreclosed by the Constitution from legislation which would further good government and forbid their representation in the legislative body by criminals or those who totally abandon the duties of their office. Is it logical to conclude that the framers intended to specifically provide that the Senate have the power of expulsion, but not the power to concur with the General Assembly and the Governor in the *327 enactment of reasonable legislation to reach the same result? To pose the question is to answer it. The analogous cases collected in the Attorney General's brief support this conclusion: State v. Winne, 12 N.J. 152 (1953); Winne v. Bergen Cty., 36 N.J. Super. 532 (Cty.Ct. 1955), rev'd on other grounds, 21 N.J. 311 (1956); In re Mattera, 34 N.J. 259 (1961); State ex rel. DeConcini v. Sullivan, 66 Ariz. 348, 188 P.2d 592 (Sup.Ct. 1948); Reilly v. Ozzard, supra; State ex rel. Blankenship v. Freeman, 440 P.2d 744 (Okl.Sup.Ct. 1968); State ex rel. James v. Reed, 364 So.2d 303 (Ala.Sup.Ct. 1978). The ultimate purpose of the Constitution is good government. Those who wrote it intended to safeguard the public against representation of the people by those who would not further this goal. Plaintiff's effort to convert the intent of the language from a safeguard of the public to a protection of the representatives from their own misconduct is at odds with the constitutional purpose.
While there are authorities to the contrary (see the discussion by Judge O'Brien in State v. Musto, supra), the better view is that the constitutional provisions affording several means whereby a legislator may suffer expulsion or vacate his seat were intended to be permissive and that neither N.J. Const. (1947), Art. IV, § IV, par. 3, alone nor the provisions in combination were intended to establish exclusive criteria foreclosing the enactment of other reasonable laws to the same end.
Without supporting authority plaintiff next argues that as a member of the Senate he "was not required to attend any minimum number of sessions, [and] indeed he need never attend." On this premise he urges the unconstitutionality of N.J.S.A. 19:3-25 as establishing an invalid attendance requirement. The argument fails because of the faulty premise. Plaintiff was under an obligation to attend legislative sessions. The duty of good faith execution of a public office without neglect of duty existed at common law. 63 Am.Jur.2d, Public Officers and Employees, § 190 at 744. The constitutional authority for the requirement is found by implication in the power *328 of each house of the Legislature to compel the attendance of its members and to prescribe penalties for failure to attend. N.J. Const. (1947), Art. IV, § IV, par. 2. It is consistent with this authority that the rules of the Senate require that "no member shall absent himself from the Senate for any period, unless excused by the president." Senate Rule 8, citing Fitzgerald's Legislative Manual at 304 (1981).
It was plaintiff's neglect and abandonment of his duty to attend legislative sessions which created the vacancy in office. Plaintiff states in his brief that "It cannot be disputed that when Defendant Merlino suspended Plaintiff's pay Plaintiff was still holding his office." This is disputed by defendants, and properly so. N.J.S.A. 19:3-25 establishes the circumstances under which a vacancy occurs, and plaintiff's neglect of his legislative duties by his consistent absences from the meetings of the Senate caused it. The vacancy occurred by operation of law. No declaration or formal expulsion proceedings were required. Under the Constitution and statute all that remained was for the unexpired term to be filled by election.
Any vacancy in the Legislature occasioned by death, resignation or otherwise shall be filled by election for the unexpired term only, as may be provided by law. [N.J. Const. (1947), Art. IV, § IV, par. 1; emphasis supplied]
The vacancy was one contemplated by the constitutional language, "or otherwise," This is but one of the intended alternative methods by which a vacancy may occur.
Plaintiff contends that a vacancy did not occur because none was declared by the Senate. This argument fails to recognize the nature of a vacancy and how it differs from an expulsion. A vacancy can result from expulsion but it is not the exclusive means. Just as a vacancy may occur by a death or resignation without expulsion so may it occur from an abandonment of office. While N.J.S.A. 19:3-25 uses the word "vacant" and N.J.S.A. 2C:51-2 "forfeit," they are identical in their operation. "Our cases aptly treat the concepts of forfeiture of office and consequential vacancy therein as correlative." Hayes v. Hudson Cty. Freeholders Bd., 116 N.J. Super. 21, 26 (App.Div. *329 1971). That case involved a forfeiture of office by an elected member of the board of chosen freeholders resulting from his criminal conviction. In defining the status of the plaintiff as a public official following his conviction under N.J.S.A. 2A:135-9 (the predecessor statute to N.J.S.A. 2C:51-2), Judge Conford wrote:
"An office is vacant whenever it is unoccupied by one who has the legal right to hold it and exercise the powers and perform the duties pertaining thereto." Paull v. Pierce, 68 N.J. Super. 521 (Law Div. 1961), and cases cited. The latter portion of the quoted excerpt appropriately describes the status of Wojtycha under the statute immediately upon the conviction and since then to the present time. [at 26-27]
Further discussion of this topic is found in 63 Am.Jur.2d, Public Officers and Employees:
The word "vacancy," as applied to a public office, has no technical meaning, and it is not to be taken in a strict technical sense in every case. It may be said that an office is vacant when it is empty and without an incumbent who has a right to exercise its functions and take its fees or emoluments, even though the vacancy is not a corporal one. Accordingly, an office is not vacant so long as it is supplied in the manner provided by the constitution or law with an incumbent who is legally qualified to exercise the powers and perform the duties which pertain to it; and, conversely, it is vacant in the eye of the law whenever it is unoccupied by a legally qualified incumbent who has the lawful right to continue therein until the happening of some future event. [§ 130 at 709]
The contingencies and events on the happening of which public offices shall be considered vacant may be and often are enumerated in the constitution or in the statutes of the state. Although statutes frequently enumerate the situations which create or constitute vacancies in public office, it has been held not essential to the existence of a vacancy that it be declared so by statute. If the events which create such a vacancy are enumerated in the constitution, the legislature is prohibited from enacting any law whereby such an event would not create a vacancy. But the expression in the constitution of the circumstances which shall bring about a vacancy does not necessarily exclude all others, or preclude the legislature from prescribing other grounds. Events so enumerated in the constitution or statutes are merely conditions upon the occurrence of any one of which the office shall become vacant, not as a penalty or forfeiture, but simply as the legal effect of any one of the events mentioned. [§ 131 at 710]
The statute calls for no action by a person, body or authority to create the vacancy. It mandates that it occur upon the moment of the happening of the event, the tenth consecutive absence of a legislator from meetings of the legislative house. The office, having been abandoned by neglect of duty, then *330 becomes vacant in the same manner as when an office holder dies. The statute creates a vacancy, not an expulsion from office, resulting from the member's own failure to serve in the office to which he was elected. The status of the member is then no different than it would have been had he failed to take the oath and his seat following his election. The statutory language, "deemed vacant," admits of no other conclusion. It merely establishes by law that which has pragmatically occurred. See, also, 63 Am.Jur.2d, Public Officers and Employees, § 188 at 472.
For the same reason there is no merit to plaintiff's argument that the action of Senate President Merlino wrongfully created the vacancy. The operative fact occurred prior to the action of Senator Merlino directing that plaintiff's pay be withheld. His action was appropriate since plaintiff was no longer a member of the Senate. A similar result has been upheld in cases arising under N.J.S.A. 40A:16-1 et seq., the Municipal Vacancy Law. N.J.S.A. 40A:16-3(g) defines a vacancy in municipal office in language similar to that in N.J.S.A. 19:3-25. It declares a vacancy in the office of mayor or a member of the governing body whenever he "fails to attend and participate in any meetings of the governing body for a period of 8 consecutive weeks without being excused from attendance...." While the Municipal Vacancy Law does not have the constitutional implications of N.J.S.A. 19:3-25, cases arising thereunder and under the predecessor statute, N.J.S.A. 40:45B-1 et seq., confirm the automatic nature of the creation of the vacancy. See Levin v. Woodbine, 181 N.J. Super. 61 (Law Div. 1981); Thomas v. Sosa, supra. Cf. In re Moffat Application, 142 N.J. Super. 217 (App. Div. 1976); Mulcahy v. Bergen Cty. Election Bd., supra; Republican Comm. of Garwood v. Garwood, 140 N.J. Super. 593 (Law Div. 1976). Plaintiff further seeks similar comfort from the fact that no writ of election was issued pursuant to N.J. Const. (1947), Art. IV, § IV, par. 1. The answer to this argument is the same: the vacancy had already occurred. The failure of the house to direct a writ of election to fill the vacancy, and the *331 Governor to issue the writ, alters not the fact that the vacancy existed. Even if the inaction of the Senate and the Governor were intentional in the belief that no vacancy existed, their misapprehension of the law does not alter its operation.
Justice Holmes once wrote "a page of history is worth a volume of logic." N.Y. Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921); 16 A.L.R. 660. The history of N.J.S.A. 19:3-25 is appropriate for consideration. Indeed the statute probably has a common law origin, for a discussion of a similar principle is found in the writings of Blackstone in the context of a vacancy in the throne resulting from misconduct of the King:
They held that this misconduct of King James amounted to an endeavour to subvert the constitution ... They therefore very prudently voted it to amount to no more than an abdication of the government and a consequent vacancy of the throne whereby the government was allowed to subsist, though the executive magistrate was gone, and the kingly office to remain, though King James was no longer king. [Blackstone, Commentaries on the Laws of England, Book I, c. 3, at 213]
Statutes creating a vacancy in the Legislature by reason of a member's failure to take his seat have existed in New Jersey since 1797. See Paterson, Laws of New Jersey (1797), at 233, "An act to regulate the election of members of the legislative council and general assembly, sheriffs and coroners in this State," § 19. This seminal statute provided for a vacancy in the Council or Assembly when one elected to office neglected or refused to take his seat. The act was amended 32 years later to include language substantially identical to the present statute. See Harrison, Laws of New Jersey (1839), at 343, "An act to regulate elections," § 27. It was further amended without significant change in 1846, Phillips and Boswell, Laws of New Jersey, at 196, and in 1930, L. 1930 c. 187, § 32. The present law, N.J.S.A. 19:3-25, was enacted in the Revised Statutes of 1937.
Thus, the principle of this statute has existed in our legislative process and State Government for almost as long as the Republic has been in existence. It has survived the adoption of two Constitutions and stood the test of time without prior challenge *332 to its validity. While it is true that when the constitutionality of a statute is challenged "the court must proceed with great caution," Reingold v. Harper, 7 N.J. Super. 525, 528 (Ch.Div. 1950), aff'd 6 N.J. 182 (1951), a statute which has been in effect and unchallenged for many years should not be invalidated unless its unconstitutionality is obvious. Flynn v. Union City, 32 N.J. Super. 518 (App.Div. 1954); Legg v. Passaic Cty., 122 N.J.L. 100 (Sup.Ct. 1939), aff'd 123 N.J.L. 263 (E. & A. 1939).
In the Legg case Justice Parker remarked that a fundamental policy of our jurisprudence is not to invalidate a statute which has been in force without any substantial challenge for many years "unless its unconstitutionality is obvious"; even without the lapse of time doubts are always resolved in favor of constitutionality. [Gibraltar Factors Corp. v. Slapo, 23 N.J. 459, 463 (1957), app. dism. 355 U.S. 13, 78 S.Ct. 44, 2 L.Ed.2d 20 (1957)]
The judicial power to invalidate a statute on constitutional grounds has been held to be one to be "delicately exercised." Harvey v. Essex Cty. Freeholders Bd., 30 N.J. 381, 388 (1959), and this is particularly so when as here the statute has a long and unchallenged history.
The significance of this statutory history is heightened by the similar background of N.J.S.A. 2C:51-2, the other statute challenged by plaintiff, which provides for a forfeiture of legislative office. This statute traces its ancestry through N.J.S.A. 2A:135-9 enacted in 1951, providing for a forfeiture by any person holding elective or appointive governmental office or position convicted of a crime touching the administration of his office or position or involving moral turpitude. The predecessors to this statute were R.S. 2:160-9 and 10 (1937) and L. 1913 c. 74. A corollary statute providing for forfeiture of office upon conviction of bribery, N.J.S.A. 2A:93-5, was preceded by R.S. 2:114-5 (1937) and L. 1898 c. 235, § 28. Thus, statutory forfeiture of office has been recognized for over 80 years.
Further support for the validity of N.J.S.A. 19:3-25 is found in N.J. Const. (1947), Art. XI, § I, par. 3, which states in part:
All laws, statutory and otherwise ... in force at the time this Constitution ... takes effect shall remain in full force until they expire or are superceded, altered or repealed by this Constitution or otherwise.
*333 In Russo v. Walsh, 18 N.J. 205, 211 (1955), the Supreme Court stated with respect to a case decision of our former Supreme Court in existence at the time the 1947 Constitution was drafted and debated, that "it is permissible to infer that the draftsmen and the delegates were cognizant of the decision and its import during their deliberations and findings." The inference is even stronger in the case of an existing statute. The delegates to the Constitutional Convention presumably had knowledge of N.J.S.A. 19:3-25. Had they intended that this statute not enjoy continued validity when they drafted and recommended the Constitution, it is reasonable to assume they would have so indicated. Not only does such intention not expressly or impliedly appear in the document, but there is nothing in the history of the Constitutional Convention of 1947 which lends countenance to the belief that the delegates intended to foreclose the Legislature from acting in this area. While not determinative, this is of no minor importance in ascertaining the significance of the relevant constitutional provisions.
As a final footnote to this determination that the Constitution does not exclude the enactment of reasonable legislation such as N.J.S.A. 19:3-25, it is well to note again the authority of State v. Musto, supra, involving N.J.S.A. 2C:51-2. Judge O'Brien's scholarly review of the law is in many respects applicable to the constitutionality issue in this case and supports the validity of N.J.S.A. 19:3-25. The automatic forfeiture of public office upon criminal conviction mandated by N.J.S.A. 2C:51-2 has identical statutory implications. It may also be noted that many cases have upheld such forfeiture under circumstances not involving the issue of exclusivity of the constitutional method for expulsion. They are informative, and the support such statutes enjoy in the law against due process and other attacks is indicative of constitutional recognition. See Local 1804, Longshoremens' Ass'n v. Waterfront Comm'n., 171 N.J. Super. 508 (App.Div. 1979), involving an office in a labor organization and upholding a forfeiture immediately upon a conviction at trial; Hayes v. Hudson Cty. Freeholders Bd., supra, upholding a similar *334 forfeiture of the office of a member of a county board of freeholders; O'Halloran v. DeCarlo, 156 N.J. Super. 249 (Law Div. 1978) aff'd 162 N.J. Super. 174 (App.Div. 1978), certif. den. 79 N.J. 469 (1978), cert. den. 442 U.S. 917, 99 S.Ct. 2837, 61 L.Ed.2d 284 (1979), upholding forfeiture of office by a city police officer immediately upon conviction of a crime and denying the right to an administrative hearing to go behind the conviction and circumvent the statutory mandate.
Plaintiff lastly asserts that even if the Constitution does not prohibit enactment of legislation establishing a vacancy in the office of a legislator under appropriate circumstances, N.J.S.A. 19:3-25 is constitutionally defective as it operates without affording due process of law. Plaintiff's standing to raise this issue is doubtful. It appears that had he been afforded an evidentiary hearing, plaintiff would have been unable to present any evidence or defense in opposition to the operation of the statute. Plaintiff argues that he has standing to assert that the statute is unconstitutional in its application to others. Established law is to the contrary. In Mountain Lakes Bd. of Ed. v. Maas, 56 N.J. Super. 245 (App.Div. 1959), plaintiffs sought to restrain defendant from entering her children in local schools unless they were immunized by vaccination. Defendant was neither the parent nor legal guardian of the children, who had been brought from Greece and were in her care. She sought to argue the unconstitutionality of the immunization requirement on the basis of her own religious freedom, but was denied standing. The court held:
Basically, the constitutionality of a statute, ordinance or regulation is open to attack only by a person whose rights are adversely affected. The burden of proof is upon the individual who claims himself harmed to show how, as to him, the statute is unconstitutional. Jones v. Opelika, 316 U.S. 584, 62 S.Ct. 1231, 86 L.Ed. 1691, 141 A.L.R. 514 (1942). No one can obtain a decision as to the invalidity of a law on the ground that it impairs the rights of others; such a one "is not the champion of any rights except his own." 11 Am.Jur., Constitutional Law, § 111, pp. 752-753 (1937), and see notes 13 and 14. Defendant may not use the children to champion her own rights and beliefs.
Insofar as defendant seeks to assert her own right to religious freedom, she has no standing. The vaccination and immunization requirement does not apply to *335 her. She has no personal responsibility for the children's religious upbringing other than in the religion in which they were raised. [at 259]
Cf. N.J. Chamber of Commerce v. N.J. Elec. Law Enforcem. Comm'n, 82 N.J. 57 (1980); Sarner v. Union Tp., 55 N.J. Super. 523 (Law Div. 1959). While plaintiff is without standing to raise the due process claim, the issue has been extensively briefed and argued. Involving as it does a matter of importance in State Government, the doubt raised should be resolved. Lack of standing should not deny the Legislature a judicial determination of the validity of this statute affecting the functioning of the legislative body.
Plaintiff asserts that his legitimate expectation of receiving the annual salary of his elected office, a right which he contends is established in N.J. Const. (1947), Art. IV, § IV, par. 7, is a property right, the deprivation of which can be accomplished only after he has been afforded procedural due process. While plaintiff contends that the action of Senator Merlino in suspending payment of his salary denied him due process, as has been seen it is the statutory command which must be reviewed as plaintiff vacated his office prior to Senator Merlino's declaration.
Due process of law is an elusive concept. "The phrase is of convenient vagueness." Hough, "Due Process of Law  Today," 32 Harv.L.Rev. 218 (1919). The Fourteenth Amendment guarantees that no person will be deprived of life, liberty or property without due process of law. The resolution of a deprivation challenge requires a determination as to whether and, if so, to what extent process is due. Thus, the first question in determining whether the Fourteenth Amendment has been offended in this case is whether plaintiff had a protected interest which under the circumstances he lost without due process. The State contends that no such interest exists and that the challenge ends upon this determination. The arguments of the Attorney General are not without appeal. Four decisions of the United States Supreme Court are cited: Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90, 94 (1971); Board of Regents v. *336 Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Dodge v. Bd. of Ed., 302 U.S. 74, 79, 58 S.Ct. 98, 108, 82 L.Ed. 57, 62 (1937); Taylor v. Beckham, 178 U.S. 548, 577, 20 S.Ct. 890, 900, 44 L.Ed. 1187, 1200 (1900). The court in Taylor v. Beckham, stated:
... [t]he decisions are numerous to the effect that public offices are mere agencies or trusts, and not property as such. Nor are the salary and emoluments property, secured by contract, but compensation for services actually rendered. Nor does the fact that a constitution may forbid the legislature from abolishing a public office or diminishing the salary thereof during the term of the incumbent change its character or make it property.... In short, generally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right. [at 577, 20 S.Ct. at 900]
The history of the Due Process Clause reveals a perceptible and continuous expansion in protected rights. New Jersey may afford greater protection than the minimum requirement established by the United States Supreme Court. The line between those rights which a private party can maintain against the government and those which constitute only a privilege granted by the government is not always easily defined. It is basic, however, in our concept of government that an individual who has a legitimate claim of entitlement may not lose it through arbitrary governmental action.
The underlying foundation for plaintiff's salary claim is found in the Constitution. N.J. Const. (1947), Art. IV, § IV, par. 7, provides that members of the Legislature "shall receive annually during the term for which they shall have been elected and while they shall hold their office, such compensation as shall, from time to time be fixed by law...." The demand for due process is stronger where the right is so established, and has been consistently supported in situations of lesser import. It has been found to protect the right of a Senator of New Jersey from exclusion from political caucus, Ammond v. McGahn, 390 F. Supp. 655 (D.N.J. 1975), rev'd on other grounds 532 F.2d 325 (3 Cir.1976), and to protect the right of a member of the General Assembly of New Jersey from exclusion from a legislative committee of which he was a member, Gewertz v. Jackman, *337 supra. In that case the court found that the rules and customs of the General Assembly created "a legitimate expectation of retaining a committee position for the legislative session, and that a member cannot be deprived of that property interest during the session without due process of law." Id. at 1061. Similarly, in Ammond v. McGahn, supra, the court stated "No elected representative of the people may be barred from participation in the forum to which he or she was elected for misconduct, no matter how egregious, without some type of hearing." Id. at 660. Plaintiff's interest is protected and it is appropriate to consider the due process issue. "An open minded approach towards recognizing such rights enables the law to afford individuals the protection that due process envisions in the divers situations in which they are affected by government decisions." Town Court Nursing Ctr., Inc. v. Beal, 586 F.2d 280, 284-285 (3 Cir.1978), rev'd on other grounds 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed. 506 (1980).
It is undisputed that plaintiff received no notification that his office was to be or had been vacated, other than his presumed knowledge of his own absences from the meetings of the Legislature and of the requirements of N.J.S.A. 19:3-25. No hearing was offered, requested or conducted. The issue is whether this was an unconstitutional deprivation of his legislative office and consequent entitlement to compensation. Obviously, members of the Legislature do not lose their constitutional rights when they embark upon the duties of their office. The Fourteenth Amendment as applied to the states affords its protection to all citizens, even to legislators against the prohibitions of their own enactments.
The fundamental requisite of due process of law is the opportunity to be heard. Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363, 1369 (1914). Its essence is that this right not be arbitrarily denied. Once having determined that the government may not take a particular action affecting private rights without affording due process of law, it is necessary *338 to ascertain what process is due. Our courts have consistently held that all that is required is fundamental fairness dictated by the circumstances. Flexibility is the lifeblood of the Due Process Clause. There is no fixed rule establishing the formality required, the test being reasonableness under the circumstances. As has been said, "the notice and nature of the hearing will depend on appropriate accommodation of the competing interests involved." Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230, 1237 (1961).
There is nothing in N.J.S.A. 19:3-25 which expressly forecloses the opportunity of a legislator to be heard regarding the facts on the basis of which his seat allegedly became vacant. The presumption of the constitutionality of every statute is accompanied by a presumption that the Legislature had knowledge of the constitutional requisites necessary for the enactment of a valid statute. The principles of due process of law are so basic that it must be assumed that in enacting N.J.S.A. 19:3-25 the Senate, General Assembly and Governor intended that the operative effect of the statute occur only when attended by such process as would render the result constitutional.
In construing a statute the presumption is that the legislature acted with existing constitutional law in mind and intended the act to function in a constitutional manner. [Lomarch Corp. v. Englewood, supra 51 N.J. at 113]
It is unnecessary that the elements which furnish that legislative intent appear in the language of the statute. State v. Profaci, 56 N.J. 346, 349 (1970).
Plaintiff was entitled to a hearing if he desired one. Upon being notified that his salary was suspended he did nothing. For the balance of his elected term he attended no session and interposed no objection to the fact that the State Treasurer was making no payment of his legislative salary. The burden to request the hearing was upon him. Only he knew whether facts existed raising an issue of the propriety of the automatic vacation of his office. Plaintiff has filed with the court no evidence in support of his motion indicating that his seat was not statutorily vacated.
*339 Presumably, the Legislature in enacting N.J.S.A. 19:3-25 intended that plaintiff be afforded an opportunity to be heard, albeit after his seat was declared vacant. This intention does not offend due process of law. While in most cases the hearing is appropriately afforded prior to the deprivation, only under the most demanding circumstances is that constitutionally required. Many reported decisions speak of the necessity for a "prior hearing," but they do not involve the direct issue of whether a subsequent hearing will suffice. The statute does not foreclose plaintiff's opportunity to be heard to proffer that he had not been absent for the requisite number of sessions, or had been excused but the request had not been recorded, or other such circumstance which would avoid his loss of office. But he may not be heard to argue that he was not granted a hearing when he requested none, particularly when, if granted a hearing, he had no facts or arguments to present in opposition to the operation of the statute.
The issue of the right to a prior hearing was presented in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). That case involved a termination of Social Security disability insurance benefits. It was held that while an evidentiary hearing was required, it was not essential that it be conducted prior to the initial termination of benefits. The court balanced the private and governmental interests involved and found that the government's interest in conserving physical and administrative resources outweighed the private interest to a prior hearing. The administrative regulation under review was found to comport with due process by insuring a meaningful opportunity to the recipient to present his case following the initial termination. The opinion emphasizes that a disabled worker is not necessarily similar to a welfare recipient requiring benefits for bare subsistence, and that were the contrary true, a prior hearing would be dictated. In his concurring opinion Justice Frankfurter also gave weight to the existence of a right to a subsequent judicial review such as plaintiff in this case is now pursuing. A comprehensive analysis of the holding of the *340 Mathews case is found in Town Court Nursing Ctr., Inc. v. Beal, supra. That case affirmed a lower court holding that a nursing home was not entitled to a prior evidentiary hearing on the termination of its medicare provider agreement. Similar precedent is found in a case arising in New Jersey. In discussing the procedural due process to which a member of the General Assembly of New Jersey was entitled upon his removal from a legislative committee, the United States District Court, in Gewertz v. Jackman, supra, said "we hold that the hearing need not be formal or prior to removal."
The United States Court of Appeals, Third Circuit, following the issuance of its opinion in Town Court Nursing Ctr., Inc. v. Beal, supra, amended its opinion 15 days later. 586 F.2d 280 (1978). Noting that in only one case has the Supreme Court held a prior hearing required, the court wrote the following:
When balancing the governmental and private interests to arrive at the process that is due, only once has the Supreme Court insisted on a full evidentiary hearing before the government decision in question became effective. The Court in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), held unconstitutional a procedure which provided for written submissions by the welfare recipient but no hearing before payments were cut off. In requiring that the welfare recipient be afforded a pretermination full evidentiary hearing at which he can appear personally, offer oral evidence and confront witnesses, Goldberg recognized that
"the crucial factor in this context ... is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. This need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy."

Id. at 264, 90 S.Ct. at 1018 (emphasis in original). The Court concluded that "the interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the state's competing concern to prevent any increase in its fiscal and administrative burdens." Id. at 266, 90 S.Ct. at 1019.
In other cases before the Supreme Court, due process has been found to be satisfied by administrative procedures that did not include a full evidentiary hearing before the deprivation. [586 F.2d at 290-291]
A similar result was reached in Greene v. McGuire, 517 F. Supp. 1330 (1981), in the United States District Court for the Southern District of New York. The case is particularly relevant *341 as it involved an automatic forfeiture of office by a police officer following criminal conviction. In sustaining the automatic nature of the forfeiture without prior hearing the court said:
This is not to imply that plaintiffs were entitled to a hearing prior to their forfeiture of public office. The New York Court of Appeals has held that, under subsection 30(1)(e) of the New York Public Officers Law, a felony conviction of a public officer will automatically result in that office becoming vacant. See Toro v. Malcolm, 44 N.Y.2d 146, 149-50, 375 N.E.2d 739, 741, 404 N.Y.S.2d 558, 561 (1978). Whatever property interest existed in that office is extinguished on conviction under the law of New York. Economico v. Village of Pelham, supra, 50 N.Y.2d [120] at 126, 405 N.E.2d [694] at 697, 428 N.Y.S.2d [213] at 215-16, and the reversal of a conviction will not entitle the former public officer to automatic reinstatement even though the disability is removed. Toro v. Malcolm, supra, 44 N.Y.2d at 150, 375 N.E.2d at 741, 404 N.Y.S.2d at 561; Sroka v. Municipal Civil Service Commission of City of Buffalo, 57 A.D.2d 1064, 395 N.Y.S.2d 854 (4th Dep't 1977). A police officer holds a position of utmost public trust and is in a class separate from most other civil service employees. Baker v. Cawley, 459 F. Supp. 1301, 1305 (S.D.N.Y. 1978), aff'd without opinion, 607 F.2d 994 (2d Cir.1979). "The slightest suspicion cast upon the honesty and integrity of the police officer makes his services to the Department and to the public at best doubtful." Id. at 1306 (quoting Cugell v. Monaghan, 201 Misc. 607, 611, 107 N.Y.S.2d 117, 122 (S.Ct. N.Y. Co. 1951)). [at 1332-1333]
See, also, Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (declaring unconstitutional a statute permitting the expulsion of public school pupils without a prior hearing); Mackey v. Montrym, 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979); Barry v. Barchi, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979); Dixon v. Love, 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977).
When a legislator has effectively abandoned the duties of his office, as plaintiff did here, the need for the establishment of the vacancy becomes urgent. The people of plaintiff's legislative district were not being represented in the governing body as they had a right to be. This is of paramount significance because of the strong societal interest. A continuance of the situation is the antithesis of our democratic form of government. On balance, the urgent need to fill a legislative office which has been abandoned outweighs the right of the individual legislator to contend he has not done so. A subsequent hearing is available *342 to any affected legislator and was available to plaintiff upon request. While the vacancy was created by operation of law rather than by action of the Legislature, the hearing was available in the legislative body from which he was excluded. When a valid claim to the office exists, the issue is one of simple resolution. The operative elements of the statute are basic and likely to be subject to little factual dispute much less a complicated one.
The automatic vacancy created by N.J.S.A. 19:3-25 does not offend the Due Process Clause, for a subsequent evidential hearing and judicial review are available. Since the statute does not forbid a hearing and the Constitution requires the right to one, the Legislature is assumed to have intended that it be afforded upon request. Plaintiff could have availed himself of the opportunity but chose not to do so. It is obvious he had no evidential basis for alleging that the statute did not effect a vacancy of his office. If he had one, it would have been presented to the court in this case.
Plaintiff has also raised as an issue the constitutionality of N.J.S.A. 2C:51-2 to one holding the office of State Senator. As with his argument relating to N.J.S.A. 19:3-25, plaintiff asserts that any forfeiture of office under N.J.S.A. 2C:51-2 following the entry of his criminal conviction is unconstitutional in that the statute impermissibly establishes an additional qualification for holding the office of State Senator beyond those expressly stated in the Constitution, and in that the Constitution provides the exclusive means whereby a Senator's right to remain in office may be terminated. The invocation of the asserted statutory forfeiture of his office by plaintiff did not occur until the date of the imposition of sentence and entry of judgment of conviction in the United States District Court for the Eastern District of New York on August 13, 1981. This was more than eight months after plaintiff's seat became vacant on December 11, 1980 pursuant to N.J.S.A. 19:3-25. Thus it is unnecessary to address this additional constitutional issue.

*343 We need not consider all reasons advanced by defendant in support of its motion. One arrow if fatal, is fatal enough. [Inland Properties Co. v. Union Properties, Inc., 60 Ohio L.Abs. 150, 151 (C.P.C. 1951)]
The determination of the validity of N.J.S.A. 19:3-25 entitles defendants to judgment in their favor. If that statute were unconstitutional and N.J.S.A. 2C:51-2 constitutional, plaintiff would be entitled to judgment for his unpaid salary from January 1 to August 13, 1981. Thus, a ruling that N.J.S.A. 19:3-25 is constitutional terminates this litigation whereas any determination on the issue of the validity of N.J.S.A. 2C:51-2 would not do so. As earlier noted, a constitutional issue should not be considered where it is unnecessary to a decision. Hertz Washmobile System v. South Orange, 41 N.J. Super. 110 (Law Div. 1956), aff'd 25 N.J. 207 (1957). Suffice it to say that the issue has been fully discussed and decided in State v. Musto, supra, with which this opinion is in full accord.
Defendants' motion for summary judgment is granted; plaintiff's motion for summary judgment is denied.